FILED

2024 Mar-25  PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **LYNN JARRETT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 4:22-cv-00430-MHH** |
| | } | |
| **MARTIN O'MALLEY** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,** [1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORADUM OPINION</u>

Lynn Jarrett has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Jarrett's claims for a period of disability, disability insurance benefits, and supplemental income based on the Administrative Law Judge's finding that Mr. Jarrett was not disabled. Mr. Jarrett argues, among other points, that the Administrative Law Judge—the ALJ—did not sufficiently evaluate the opinions of several examining doctors.  (Doc. 12, pp. 15-20; Doc. 20, pp. 1-9).  After careful review of the administrative record,

---

[1] On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Jarrett had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[2]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited January 29, 2024).

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Mr. Jarrett applied for a period of disability, disability insurance benefits, and supplemental security income on August 12, 2019. (Doc. 6-8, pp. 2, 4-13). Mr. Jarrett alleged that his disability began on May 1, 2019. (Doc. 6-8, p. 4).[3] The Social Security Commissioner initially denied Mr. Jarrett's claims, and Mr. Jarrett requested a hearing before an Administrative Law Judge. (Doc. 6-6, p. 27). Because of COVID, Mr. Jarrett and his attorney had a telephone hearing with an ALJ on September 7, 2021. (Doc. 6-3, pp. 23, 45-85). A vocational expert testified at the hearing. (Doc. 6-3, pp. 73-79).

The ALJ issued an unfavorable decision on September 24, 2021. (Doc. 6-3, pp. 23-36). On March 2, 2022, the Appeals Council declined Mr. Jarrett's request

---

[3] In January 2018, Mr. Jarrett applied for disability benefits and asserted that he became disabled on March 15, 2017. (Doc. 6-3, p. 23). The Commissioner initially denied his claims; Mr. Jarrett requested a hearing before an ALJ but later withdrew the request; and the ALJ dismissed Mr. Jarrett's application on July 19, 2019. (Doc. 6-3, p. 23).

for review, (Doc. 6-3, p. 2), making the Commissioner's decision final and thus a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Jarrett's Medical Records*

To support his application, Mr. Jarrett submitted medical records relating to the treatment and diagnoses of several medical conditions including diabetes, peripheral neuropathy, hearing loss, right shoulder degenerative disease, high blood pressure, high cholesterol, adrenal insufficiency, attention-deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), persistent depressive disorder, anxiety disorder, and chronic pain syndrome.[4]  The Court has reviewed Mr. Jarrett's complete medical history and summarizes the following medical records because they are most relevant to Mr. Jarrett's arguments in this appeal.

### *Physical Impairments*

In 2007, Dr. Bobby Johnson at Endocrinology & Diabetes Associates diagnosed Mr. Jarrett with uncontrolled type 2 diabetes and neuropathy.  (Doc. 6-18, p. 12).  Mr. Jarrett's symptoms included blurred vision and pain in his feet.  (Doc. 6-18, p. 11).  Dr. Johnson prescribed insulin, Lantus, and a Humalog pump for Mr. Jarrett.

---

[4] Adrenal insufficiency or Addison's disease occurs when the adrenal glands do not make enough of certain hormones, including cortisol "which is essential for life."  Common symptoms of adrenal insufficiency include "fatigue, muscle weakness, loss of appetite, weight loss, and abdominal pain."  *See* https://www.niddk.nih.gov/health-information/endocrine-diseases/adrenal-insufficiency-addisons-disease (last visited January 31, 2024).

(Doc. 6-18, p. 12). Because Mr. Jarrett's blood sugar levels fluctuated significantly in 2008, Dr. Johnson frequently adjusted Mr. Jarrett's insulin dose. (Doc. 6-18, pp. 4-10). By a December 11, 2008 appointment, Dr. Johnson changed Mr. Jarrett's diabetes diagnosis to type 1. (Doc. 6-18, p. 4).[5]

Between 2009 and 2012, Mr. Jarrett's blood sugar levels continued to fluctuate. (Doc. 6-17, pp. 22-50; Doc. 6-18, pp. 2-3). At a July 31, 2012 visit, Mr. Jarrett reported to Dr. Johnson that he was working eighty hours a week and did not think he could keep his blood sugar in a normal range. (Doc. 6-17, p. 22).

In September 2013, Mr. Jarrett was hospitalized for three days at Marshall Medical Center for dizziness and altered mental state and diagnosed with severe diabetic ketoacidosis. (Doc. 6-15, pp. 61-86). During visits with Dr. David Campbell and Dr. Neil Yeager between November 2013 and July 2015, Mr. Jarrett complained of low and high blood sugar levels and foot pain. (Doc. 6-12, pp. 15-75). Dr. Campbell and Dr. Yeager diagnosed peripheral neuropathy, anxiety disorder, type 1 diabetes, and high cholesterol. (Doc. 6-12, pp. 15-75).

In July 2015, Mr. Jarrett fell from a porch and fractured his right shoulder. (Doc. 6-12, pp. 76, 78; Doc. 6-16, pp. 15-16). Dr. Mathew Smith at Premier

---

[5] With type 1 diabetes, the body does not make insulin. Individuals with type 1 diabetes must take insulin every day. With type 2 diabetes, the body does not use insulin well and cannot "keep blood sugar at normal levels." *See* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited January 30, 2024).

Orthopedic Surgery performed joint reconstruction surgery on Mr. Jarrett's right shoulder. (Doc. 6-16, pp. 16-21). Throughout physical therapy, Mr. Jarrett rated his pain at 2/10, and he had improved range of motion in "all planes" by the end of physical therapy. (Doc. 6-15, pp. 87-108).

During visits with Dr. Johnson in 2016, Mr. Jarrett reported fluctuations in his blood sugar levels, received a new insulin pump, and stated that he felt "well." (Doc. 6-17, pp. 1-7). By a July 2017 visit with Dr. Campbell, Mr. Jarrett reported that he could no longer work, had severe pain in his legs, had decreased function and loss of sensation in his upper right arm, and had increased anxiety because of his divorce. (Doc. 6-12, p. 133) Dr. Campbell's physical examination showed decreased sensation in Mr. Jarrett's lower left and right leg and decreased strength in his upper right arm. (Doc. 6-12, p. 135). Dr. Campbell's assessment included "[p]oor[ly] control[led] type 1 diabetes mellitus" and peripheral neuropathy. (Doc. 6-12, p. 135).

Mr. Jarrett saw endocrinologist Dr. Monica Robles at the Anniston Medical Clinic for diabetes monitoring and treatment. (Doc. 6-14, pp. 40-52). During a May 2018 visit, Dr. Robles noted that Mr. Jarrett had "neuropathy in both legs." (Doc. 6-14, p. 52). Mr. Jarrett used a "very old OmniPod pump;" Dr. Robles wanted Mr. Jarrett to use a "new Medtronic pump" with continuous glucose monitoring if insurance would cover it because that type of pump would be "very important for

him." (Doc. 6-14, p. 52). Dr. Robles noted that Mr. Jarrett's blood sugar levels ranged between the 40s and 200s in the morning, but his blood sugar levels frequently were in the 40s. (Doc. 6-14, p. 52).[6] Dr. Robles discontinued Mr. Jarrett's use of his insulin pump, "put him on a basal bolus regimen with multiple daily [insulin] injections," and instructed Mr. Jarrett to call her if he "experience[d] any hypoglycemia." (Doc. 6-14, p. 52).[7]

At a June 2018 visit, Dr. Robles noted that Mr. Jarrett had completed training to use his glucose monitor, test strips, and lancets; that his fasting blood sugar levels had been in the 110s to 160s; that he had a few morning blood sugar levels "in the 200s and a few in the 50s;" and that he had levels in the "110s to 220s" later in the day. (Doc. 6-14, p. 49). Dr. Robles reduced Mr. Jarrett's insulin intake at night and instructed him to eat a small snack before bed. (Doc. 6-14, p. 49). Dr. Robles noted that Mr. Jarrett had elevated liver enzymes and referred him to gastroenterologist Dr. Winter Wilson for evaluation. (Doc. 6-14, p. 49).

---

[6] The recommended blood sugar range in the morning before eating is 80-130; the recommended range one to two hours after a meal is below 180. *See* https://www.healthline.com/health/diabetes/blood-sugar-level-chart#recommended-ranges (last visited January 30, 2024).

[7] Hypoglycemia is a "condition in which your blood sugar (glucose) level is lower than the standard range." *See* https://www.mayoclinic.org/diseases-conditions/hypoglycemia/symptoms-causes/syc-20373685 (last visited January 30, 2024). Hyperglycemia occurs when the blood sugar level is higher than the normal range. "[S]tress can trigger hyperglycemia . . . because hormones your body makes to fight . . . stress can also cause blood sugar to rise." Long-term complications of hyperglycemia can include neuropathy and skin infections and ulcerations in the feet. *See* https://www.mayoclinic.org/diseases-conditions/hyperglycemia/symptoms-causes/syc-20373631 (last visited February 6, 2024).

On July 17 and August 8, 2018, Mr. Jarrett saw Dr. Wilson's certified nurse practitioner Jessica Howard at Medical Specialists of North Alabama regarding his elevated liver enzymes. (Doc. 6-12, pp. 152-66). In July, Mr. Jarrett reported that his A1C was 13.9, his diabetes was not well-controlled, and he was "trying to get coverage for an insulin pump but [could] not afford it." (Doc. 6-12, p. 165).[8] CRNP Howard noted that Mr. Jarrett had an enlarged liver, and imaging indicated a moderately distended gallbladder. (Doc. 6-12, pp. 160, 165). At the August 2018 visit, Mr. Jarrett complained of fatigue and constipation and reported that after the July 2018 visit, he developed nausea, vomiting, and diarrhea every morning until around noon. (Doc. 6-12, p. 154). CRNP Howard diagnosed acute hepatitis B and referred Mr. Jarrett to the hepatology department at Vanderbilt for management and treatment. (Doc. 6-12, p. 154).

On August 1, 2018, Mr. Jarrett reported to Dr. Robles that his blood sugar numbers were between 79-100 in the mornings, in the 200s before lunch, in the 160s to 200s before supper, and in the 200s at bedtime. (Doc. 6-14, p. 46). Mr. Jarrett's A1C level was 9.7. (Doc. 6-14, p. 46). Dr. Robles increased his insulin intake at breakfast and at supper. (Doc. 6-14, p. 46). Sometime in August 2018, Mr. Jarrett

---

[8] "The A1C test measures the amount of hemoglobin with attached glucose and reflects [the] average blood glucose levels over the past 3 months. The A1C test result is reported as a percentage. The higher the percentage, the higher [the] blood glucose levels have been. A normal A1C level is below 5.7 percent." *See* https://www.niddk.nih.gov/health-information/diagnostic-tests/a1c-test (last visited February 6, 2024).

received a Medtronic insulin pump.  (Doc. 6-18, p. 38).  On August 24, 2018, when Mr. Jarrett attempted to replace the pump without supervision, the insulin pump malfunctioned, and the pump was not able to control his blood sugar.  (Doc. 6-18, p. 38).  His blood sugar levels rose to 700.  (Doc. 6-18, pp. 38, 56).  Mr. Jarrett experienced muscle aches, dizziness, and syncope.  (Doc. 6-18, p. 51).  After fixing a kink in the tubing in Mr. Jarrett's pump, his sugar levels returned to the 90-110 range.  (Doc. 6-18, pp. 38-39).

During a physical exam on August 24, 2018, Mr. Jarrett exhibited "generalized weakness" but had normal range of motion in his extremities and 5/5 muscle strength in his upper and lower extremities.  (Doc. 6-18, pp. 52, 58).  Mr. Jarrett's diagnoses included diabetic ketoacidosis, insulin dependent diabetes, chronic pain, and peripheral neuropathy.  (Doc. 6-18, pp. 54, 58-59).

On Dr. Wilson's referral, Mr. Jarrett saw Dr. Andrew Scanga at Vanderbilt University Medical Center on September 7, 2018 for evaluation of his hepatitis B.  (Doc. 6-13, p. 53).  Mr. Jarrett reported that around the time of his hepatitis B diagnosis, he felt poorly and had nausea and vomiting, but those symptoms had resolved.  (Doc. 6-13, p. 53).  Test results indicated that Mr. Jarrett had stage II liver fibrosis, so Dr. Scanga prescribed "tenofovir alafenamide 25 mg per day."  (Doc. 6-13, pp. 43, 55).

During a September 12, 2018 visit with Mr. Jarrett, Dr. Robles noted that Mr. Jarrett's blood sugar levels were controlled better when his pump was in "auto mode." She recommended that Mr. Jarrett use auto mode "as much as possible" to help lower his A1C level. (Doc. 6-14, p. 42).

On November 29, 2018, Dr. Robles noted that Mr. Jarrett's insulin pump was in auto mode "87% of the time" and that he was "doing great." (Doc. 6-14, p. 39). Mr. Jarrett reported that he had hypoglycemic symptoms even when his blood sugar levels were not "really low" and that "seeing numbers in the 80s" made him feel "very nervous." (Doc. 6-14, p. 39). Dr. Robles noted that Mr. Jarrett's A1C level fell from 9.7 to 6.3 and that his insulin pump was working well. (6-14, p. 39).

On December 7, 2018, Mr. Jarrett visited Dr. Scanga for a follow-up appointment. (Doc. 6-13, p. 38). Dr. Scanga noted that Mr. Jarrett had "[c]hronic viral hepatitis B" in the "positive active carrier state." (Doc. 6-13, p. 38). Dr. Scanga wrote that Mr. Jarrett had improved with tenofovir therapy, that Mr. Jarrett should be vaccinated against hepatitis A, and that Mr. Jarrett should be screened via ultrasound every six months for "hepatocellular carcinoma." (Doc. 6-13, p. 38).

When Mr. Jarrett returned to Dr. Robles on January 11 and 23, 2019, Dr. Robles found that Mr. Jarrett was controlling his blood sugar levels well, that his insulin pump was in auto mode "80% of the time," that he had no "significant hypoglycemia," and that his blood sugar levels were a "little too high after

breakfast." (Doc. 6-14, pp. 31, 35). Dr. Robles adjusted Mr. Jarrett's bolus and increased his insulin to carbohydrate ratio. (Doc. 6-14, p. 31). Mr. Jarrett reported that his neuropathy pain was worse and that he took "hydrocodone with ibuprofen" for the pain. (Doc. 6-14, p. 31). Dr. Robles noted that Mr. Jarrett had "some hard knots on the base of his feet," prescribed Lyrica 75 mg twice a day for neuropathy, and referred Mr. Jarrett to a podiatrist. (Doc. 6-14, p. 31).

On January 29, 2019, podiatrist Dr. Marvin Williams saw Mr. Jarrett and noted that he had an "elevated lesion, eruption[,] and papule" on the sole of his left foot and an antalgic and painful gait. (Doc. 6-14, p. 27). Mr. Jarrett reported "moderate, aching, and throbbing" pain in his feet. (Doc. 6-14, p. 27). Dr. Williams prescribed mupirocin ointment for the lesion and educated Mr. Jarrett on diabetic foot ulcers and infections. (Doc. 6-14, p. 28).

Mr. Jarrett saw Dr. Zulfiqar Rana on March 14, 2019 to establish care because Mr. Jarrett had been "discharged from the care of Lakeside Clinic in Guntersville" and no longer was seeing Dr. Campbell. (Doc. 6-14, p. 24). Mr. Jarrett reported that his appetite had decreased and that he slept an average of three hours per night. (Doc. 6-14, p. 23). Dr. Rana noted that Mr. Jarrett had diabetic neuropathy and that he took Lyrica and hydrocodone with ibuprofen. (Doc. 6-14, pp. 23-24). Dr. Rana referred Mr. Jarrett to pain management for chronic pain. (Doc. 6-14, p. 24).

During an April 15, 2019 visit, Dr. Robles noted that Mr. Jarrett was "excellent," that he had had "no significant hypoglycemia" for two weeks, and that his A1C level was 6.2.  (Doc. 6-14, p. 22).  Mr. Jarrett reported one episode when his blood sugar level "went into the 50s overnight" when his pump was in auto mode. (Doc. 6-14, p. 22).  Dr. Robles decreased the "aggressiveness" of Mr. Jarrett's insulin pump to "reduce the chance" of him having a very low blood sugar level; Dr. Robles increased the "active insulin time from 3-1/2 hours to 4 hours."  (Doc. 6-14, p. 22). Mr. Jarrett reported chronic fatigue, and Dr. Robles noted that, because of Mr. Jarrett's diabetes, she wanted to rule out adrenal insufficiency.  (Doc. 6-14, p. 22).

At a May 14, 2019 visit, Dr. Robles noted that Mr. Jarrett was on a "closed loop pump," was "doing excellent," and had "very good" blood sugar levels.  (Doc. 6-14, p. 18).  She noted that Mr. Jarrett's adrenal sufficiency tests were abnormal.  She prescribed hydrocortisone tablets and Solu-Medrol, indicated Mr. Jarrett might have "autoimmune adrenal disease," and recommended that Mr. Jarrett wear a medical alert bracelet.  (Doc. 6-14, p. 18).  Dr. Robles ordered an MRI of Mr. Jarrett's brain without contrast and blood tests to evaluate his adrenal insufficiency.  (Doc. 6-14, p. 18).

On July 12, 2019, Dr. Robles noted that Mr. Jarrett had "excellent control" of his blood sugar levels with "his closed-loop insulin pump," that he remained in auto-mode 79 percent of the time, and that his A1C level was 6.0.  (Doc. 6-14, p. 12).  Dr.

Robles reported that even after starting Mr. Jarrett on the hydrocortisone tablets, his blood sugar numbers remained "at goal." (Doc. 6-14, p. 12). Mr. Jarrett's diabetic foot exam revealed normal pulses and intact "vibration senses." (Doc. 6-14, p. 12).

At an August 23, 2019 visit, Mr. Jarrett told Dr. Robles that he was "very frustrated" that every time he went into manual mode on his insulin pump, his blood sugar levels dropped, and he had to eat a lot to keep his blood sugar levels up. (Doc. 6-14, p. 9). Mr. Jarrett also reported that "every time he boluse[d]," his blood sugar levels dropped and caused the alarm to beep, which caused "alarm fatigue." (Doc. 6-14, p. 9). Dr. Robles reduced the "basal rate from 1.6 to 1.3," decreased the "carb ratio from 1:10 to 1:15," and kept the alarm signal for only "severe low[]" blood sugar levels when his pump was in manual mode. (Doc. 6-14, p. 9). Dr. Robles noted that Mr. Jarrett's brain MRI did not show evidence of a pituitary tumor. (Doc. 6-14, p. 9). Dr. Robles also noted that Mr. Jarrett had elevated blood pressure. She asked him to keep a blood pressure log and bring it to his next appointment. (Doc. 6-14, p. 9).

On October 16, 2019, Dr. Robles noted that Mr. Jarrett was "doing very well," usually had blood sugar levels between the "120s to 160s with a little spike in the afternoon related to his dinnertime meal," was "at goal 76% of the time," was hyperglycemic "26% of the time," had no "significant hypoglycemia," and had his insulin pump on auto mode "70% of the time." (Doc. 6-15, p. 53). Mr. Jarrett

reported that he sometimes could not wear his glucose sensor because he sweat at work.  (Doc. 6-15, p. 53).  At a February 27, 2020 visit, Dr. Robles noted that Mr. Jarrett had his insulin pump on auto mode "84% of the time," maintained a normal blood sugar range "68% of the time," had "no significant hypoglycemia," and had a "few miscalculations after certain meals."  (Doc. 6-15, p. 48).  Dr. Robles noted Mr. Jarrett's previous diagnoses of peripheral neuropathy, hepatitis B, chronic pain, depression, anxiety, high blood pressure, high cholesterol, adrenal insufficiency, and type 1 diabetes mellitus with hyperglycemia. (Doc. 6-15, pp. 45, 50).

At Mr. Jarrett's appointments with Dr. Robles in 2019 and 2020, Dr. Robles's "[n]eurologic evaluation[s]" revealed that Mr. Jarrett had a normal remote and recent memory, attention span, speech, thought content, and ability to concentrate during the visits.  (Doc. 6-14, pp. 8, 12, 17, 21, 31, 35, 49, 52; Doc. 6-15, p. 47, 52 ).

On March 3, 2021, during a follow up at Vanderbilt, nurse practitioner Ashley Singleton noted that Mr. Jarrett could not complete a scheduled ultrasound because of an "episode of hypoglycemia."  (Doc. 6-4, p. 17).

*Mental Impairments*

In August 2013, Mr. Jarrett visited Dr. Campbell at Lakeside North and complained of anxiety and panic attacks.  (Doc. 6-12, p. 11).  Mr. Jarrett explained that Xanax helped, but he needed a refill.  (Doc. 6-12, p. 11).  Dr. Campbell noted that Mr. Jarrett's medical history included insomnia and panic disorder, and his

medications included Xanax.  (Doc. 6-12, p. 11).  Dr. Campbell diagnosed Mr. Jarrett with anxiety disorder and refilled his Xanax prescription.  (Doc. 6-12, p. 13). Between 2013 and 2015, Mr. Jarrett visited Dr. Campbell, and Dr. Campbell maintained the generalized anxiety disorder diagnosis.  (Doc. 6-12, pp. 15-75).

In July 2015, Mr. Jarrett reported to Dr. Campbell that he was struggling because he was separated from his wife.  He had been sleeping poorly, and he had taken three weeks off from work.  Mr. Jarrett asked Dr. Campbell to increase in his Xanax prescription.  (Doc. 6-12, p. 72).  Dr. Campbell diagnosed fatigue and panic, increased Mr. Jarrett's Xanax prescription from two to three times a day, and added a Lexapro prescription for anxiety.  (Doc. 6-12, pp. 72-75).[9]  In July 2017, Dr. Campbell noted Mr. Jarrett's generalized anxiety diagnosis.  (Doc. 6-12, p. 135).

Mr. Jarrett reported to Dr. Rana on March 14, 2019 that he had severe anxiety, depression, nervousness, and difficulty sleeping.  (Doc. 6-14, p. 24).  Dr. Rana referred Mr. Jarrett to psychiatry.  (Doc. 6-14, p. 24).  On March 27, 2019, Mr. Jarrett saw licensed associate counselor and licensed social worker Tekeisha Goggins at Grayson & Associates for an initial mental health assessment.  (Doc. 6-13, p. 71). Ms. Goggins noted that Mr. Jarrett "presented with depression [and] anxiety."  (Doc. 6-13, p. 71).  Mr. Jarrett stated that he was twice divorced, that he had two teenage

---

[9] The Court has not located in the administrative record notes for mental health treatment between July 2017 and March 2019.

children, and that his second marriage of 20 years ended five years prior because his wife cheated on him. (Doc. 6-13, p. 71). He indicated that he lost his job after his second divorce, lived alone in a house on his parent's property, worked part-time, had multiple health problems, and had applied for disability. (Doc. 6-13, p. 71). Mr. Jarrett stated that he felt depressed and had sleep disturbances. (Doc. 6-13, p. 71). Mr. Jarrett reported flashbacks to when he saw his dad after surgery and fainted because he thought his dad was dead. Mr. Jarrett's panic attacks started after that incident. (Doc. 6-13, p. 71).

Mr. Jarrett returned to Ms. Goggins on April 4, 2019 and reported that his insulin pump woke him up at night, that he got anxious and easily angered, that he told his boss he would fight him if he continued to show disrespect, and that his kids would tell him to calm down when he got angry. (Doc. 6-13, p. 69). Mr. Jarrett reported that he had guilt about his past and inability to forgive himself. (Doc. 6-13, p. 69). Ms. Goggins noted that Mr. Jarrett had a dysphoric mood and blunted affect. (Doc. 6-13, p. 69). Ms. Goggins counseled Mr. Jarrett to help him cope with his anxiety and manage his anger. (Doc. 6-13, pp. 69-70).

On April 25, 2019, Mr. Jarrett saw psychiatric nurse practitioner Ann Couch at Grayson & Associates. (Doc. 6-13, p. 63). Mr. Jarrett stated that he lived with his two teenaged sons, had been divorced for five years, and worked for O'Reilly Auto Parts part-time as a driver. (Doc. 6-13, p. 63). Mr. Jarrett reported that he had

anxiety regarding the "what ifs" relating to the deaths of his parents, had panic attacks, slept only two to three hours each night, and had had problems falling and staying asleep for five years. (Doc. 6-13, p. 63). Mr. Jarrett stated that he had an irritable mood, disliked being around others, and had a "roller coaster" of emotions. (Doc. 6-13, p. 63). CRNP Couch noted that Mr. Jarrett had diabetes, was legally deaf, and had had shoulder surgery. (Doc. 6-13, p. 63). CRNP Couch found that Mr. Jarrett had pressured speech, a depressed and anxious mood, and goal-directed thinking. (Doc. 6-13, p. 64). Mr. Jarrett reported visual hallucinations in the form of peripheral lights and had auditory hallucinations in which he heard his name called. (Doc. 6-13, p. 64).

Using a mood disorder questionnaire, the PHQ-9 assessment tool for depression, and the GAD-7 assessment tool for anxiety, CRNP Couch screened Mr. Jarrett for depression. (Doc. 6-13, pp. 65-66). On the mood questionnaire, Mr. Jarrett indicated that in the past, he had had times where he felt so hyper that others thought he was not himself; was so irritable that he shouted and started fights; was more talkative or spoke faster than usual; had racing thoughts he could not slow; was easily distracted and had trouble concentrating or staying on track; and did excessive, foolish, or risky things. (Doc. 6-13, p. 66). On the PHQ-9 assessment, Mr. Jarrett indicated that nearly every day he had little interest or pleasure in things; felt down, depressed, or hopeless; had trouble falling and staying asleep; felt tired

and had little energy; and felt bad about himself.  (Doc. 6-13, p. 65).  He scored a 19

on the PHQ-9, indicating moderately severe depression.  (Doc. 6-13, p. 65).[10]  On

the GAD-7 anxiety assessment, Mr. Jarrett indicated that he regularly felt nervous,

anxious, or on edge; could not stop or control his worry; worried too much about

different things; had trouble relaxing; was so restless he could not sit still; was easily

annoyed or irritable; and felt afraid that something awful might happen.  (Doc. 6-13,

p. 65).  He scored a 21 on the GAD-7, indicating severe anxiety.  (Doc. 6-13, p.

65).[11]   CRNP Couch's diagnosed PTSD, generalized anxiety disorder with

agoraphobia, depressive mood, and insomnia.  (Doc. 6-13, p. 64).  CRNP Couch

prescribed Paxil for PTSD, mood, and depression; Depakote for racing thoughts; and

Doxepin for insomnia.  (Doc. 6-13, p. 64).

On April 25, 2019, Mr. Jarrett also saw Ms. Goggins who noted that Mr. Jarrett

had an anxious mood and congruent affect.  (Doc. 6-13, p. 67).  Mr. Jarrett reported

that he used marijuana to self-medicate and that he had used marijuana for the "last

time" the night before because he had decided to "take medication" and "pursue

counseling."  (Doc. 6-13, p. 67).  Mr. Jarrett described his traumatic events in detail:

> He talked about being recruited during adolescence by a doctor
> in his community.  He verbalized he enjoyed the things he got

---

[10]  A PHQ-9 score of 15-19 indicates moderately severe depression, and a score of 20-27 indicates severe depression.  *See*  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited January 31, 2024).

[11]  A GAD-7 score of 15 or greater indicates severe anxiety.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7306644/ (last visited January 31, 2024).

> into. [He] stated he did hurt others, but felt like he was helping because the people were offenders themselves. He stated that when he walked away it was because "innocent" people were targeted. He reported he remember[ed] having to protect himself because "getting out [was] frowned upon." [He] [a]lso verbalized shame and guilt.

(Doc. 6-13, p. 67). Mr. Jarrett reflected on crimes that he prevented or stopped while working on the road and described how he had to fight, threaten, and protect others. He stated that his mind never stopped and that he stayed alert and watched his back. (Doc. 6-13, p. 67). Ms. Goggins wrote that Mr. Jarrett's hypervigilance was a symptom of his ADHD and PTSD. (Doc. 6-13, pp. 67-68).

At a May 30, 2019 session with Ms. Goggins, Mr. Jarrett reported that he was worried because his mother was in the hospital, and he felt his parents' health was failing because they were worried about his inability to work. (Doc. 6-13, p. 60). Mr. Jarrett stated that he was "unable to work but still [went] to work," could not make enough to pay his bills, could not afford to pay his insurance premiums, and could not afford the copay for counseling. (Doc. 6-13, pp. 60-61). He told Ms. Goggins that he planned to work full-time because he would not allow his parents to sell property to support him. (Doc. 6-13, p. 60). Mr. Jarrett stated that he had no suicidal ideations but "reported that he would rather work than not be able to support himself" and that he was "unable to work consistently." (Doc. 6-13, p. 61). Mr. Jarrett indicated that he was angry because his ex-wife did not support their children financially or emotionally and that he did not want to do something that he would

regret.  (Doc. 6-13, p. 60).  Mr. Jarrett reported that he stopped taking Paxil because it made him feel angry, was not taking Depakote because the pharmacist told him it would be "hard on [his] liver," but he took Xanax every other night to help him sleep.  (Doc. 6-13, pp. 60-61).  Ms. Goggins noted that Mr. Jarrett "became tearful and reported [that] stress cause[d] him to feel sick" and that he was not "well enough for his children."  (Doc. 6-13, p. 61).

On June 10, 2019, Mr. Jarrett returned to CRNP Couch and reported that Paxil made him irritable and that he was worried about his parents, his job prospects, and Depakote hurting his liver.  (Doc. 6-13, p. 59).  CRNP Couch noted Mr. Jarrett's hepatitis B and Addison's disease diagnoses.  (Doc. 6-13, p. 59).[12]

Mr. Jarrett saw CRNP Couch on January 2, 2020 and reported that his mother had passed away, that he had social anxiety, that he had stopped taking Xanax because it was not helping him, and that Wellbutrin helped but he wanted to try Cymbalta.  (Doc. 6-15, p. 58).  Mr. Jarrett received prescriptions for Cymbalta 60 mg, Xanax 25 mg, and Wellbutrin 150 mg.  (Doc. 6-15, p. 57).  Mr. Jarrett reported that he felt desperate, had a depressed mood, was irritable, felt anxious, had panic attacks "24/7," and had decreased sleep.  (Doc. 6-15, p. 58).  CRNP Couch found that Mr. Jarrett was cooperative and had a depressed and anxious mood, congruent

---

[12]  One page seems to be missing from CRNP Couch's treatment notes for this visit.

affect, logical thought processes, intact attention and concentration, a poor fund of knowledge, and fair insight and judgment. (Doc. 6-15, p. 57). CRNP Couch diagnosed Mr. Jarrett with generalized anxiety disorder and grief and prescribed Seroquel for his mood and sleep issues. (Doc. 6-15, p. 57).[13]

Mr. Jarrett returned to CRNP Couch on March 2, 2020 and reported struggles regulating his diabetes, low energy, low interest, irritability, anxious feelings, and three to four hours of sleep each night. (Doc. 6-15, p. 60). Mr. Jarrett reported that he did not want to leave his home and that he was still grieving the loss of his mother. (Doc. 6-15, p. 60). He stated that Cymbalta had helped, but CRNP Couch noted that Mr. Jarrett was not taking psychiatric medication at the time of the visit. CRNP Couch found Mr. Jarrett cooperative, but he had a depressed and anxious mood, congruent affect, loose thought processes, poor fund of knowledge, fair insight, and poor judgment. (Doc. 6-15, p. 59). CRNP Couch diagnosed anxiety and grief, and she again prescribed Cymbalta. (Doc. 6-15, p. 59).

### Consultative Opinions

### Dr. Robles's Medical Source Statement

On August 26, 2019, Dr. Robles completed a "Diabetes Residual Functional Capacity Questionnaire" at the request of Mr. Jarrett's attorney. (Doc. 6-14, pp. 54-

---

[13] Seroquel is an antipsychotic medication used to treat bipolar disorder, schizophrenia, and major depressive disorder. *See* https://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/side-effects/drg-20066912?p=1 (last visited January 31, 2024).

57). Dr. Robles opined that Mr. Jarrett's hyperglycemic and hypoglycemic episodes would cause him to take an unknown number of unscheduled breaks during the workday to check his blood sugar levels. (Doc. 6-14, pp. 54-56). Dr. Robles indicated that Mr. Jarrett would not need to lie down or sit quietly during the breaks, but he would need a few minutes before he could return to work. (Doc. 6-14, p. 56). Dr. Robles indicated that Mr. Jarrett could stand or walk for four hours and sit for at least six hours during an eight-hour workday; had no noise or environmental restrictions; and should avoid concentrated exposure to extreme cold, all exposure to extreme heat, and hazards like machinery. (Doc. 6-14, p. 57). Dr. Robles indicated that Mr. Jarrett could tolerate moderate stress at work. (Doc. 6-15, p. 55). Dr. Robles opined that Mr. Jarrett's diabetes would rarely interfere with concentration and the attention needed to perform simple tasks at work. (Doc. 6-14, p. 55). Dr. Robles placed a "N/A" next to the questions for which she did not render an opinion. (Doc. 6-14, pp. 54-57).

*Dr. Rinn's Consultative Mental Examination*

On November 19, 2019, at the request of the Social Security Administration, licensed psychologist Dr. Roger Rinn examined Mr. Jarrett and reviewed background information the Social Security Administration provided. (Doc. 6-14, pp. 102-105). Mr. Jarrett stated that he lived with his teenage daughter and son in a trailer on his parents' property and that his mother had cancer and was "quite ill."

(Doc. 6-14, p. 104).  Mr. Jarrett reported that he completed the ninth grade, was in special education classes, struggled with math and science, and did not obtain a GED.  (Doc. 6-14, pp. 103-04).  Mr. Jarrett indicated that he worked construction most of his life, was trained in welding, and had worked as a millwright.  (Doc. 6-14, p. 103).  He reported that he "ha[d] been unemployed for two years but occasionally work[ed] at a local auto parts store."  (Doc. 6-14, p. 103).  Mr. Jarrett stated that he watched television when he returned from work, bathed five days a week, brushed his teeth daily, drove, did little shopping because of his anxiety, and infrequently attended church.  (Doc. 6-14, p. 104).

Dr. Rinn noted Mr. Jarrett's medical history, including his diagnosis of hepatitis B, diabetes, adrenal insufficiency, and PTSD.  (Doc. 6-14, p. 103).  Mr. Jarrett attributed his depression and feelings of helplessness to being overworked.  (Doc. 6-14, p. 103).  Mr. Jarrett indicated that he had difficulty falling asleep, was "up and down" all night, slept three hours a night, and was tired all day.  (Doc. 6-14, p. 103).  Mr. Jarrett reported problems with inattentiveness and described himself as easily distractable and somewhat impulsive.  (Doc. 6-14, p. 103).

Dr. Rinn wrote that he had to "speak loudly and clearly for [Mr. Jarrett] to understand" because Mr. Jarrett was "hard of hearing," that Mr. Jarrett's "foot shook" during the interview, that Mr. Jarrett had "difficulty sitting still," and that Mr. Jarrett had an euthymic mood.  (Doc. 6-14, p. 104).  In testing, Mr. Jarrett

demonstrated average vocabulary, grammar, and fund of knowledge; had intact recent and remote memory; had average immediate recall; and was "socially competent and pleasant." (Doc. 6-14, p. 104). Dr. Rinn's diagnosed "Attention Deficit/Hyperactivity Disorder, Combined Presentation," "Persistent Depressive Disorder," and substance use disorders. (Doc. 6-14, pp. 104-105). Dr. Rinn explained that Mr. Jarrett had "a history of maladaptive behaviors including depressive symptoms, inattention, hyperactivity and impulsivity;" was "experiencing sleep problems;" was "sad much of the day;" was easily distractible and impulsive; and might "have difficulty responding appropriately to supervisors and coworkers although his social skills [were] quite good." (Doc. 6-14, p. 105). Dr. Rinn wrote that work pressures might "be a particular problem" because of Mr. Jarrett's Attention Deficit/Hyperactivity Disorder and depression. (Doc. 6-14, p. 105).

### CRNP Couch's Mental Source Statement

On February 1, 2021, CRNP Couch completed a mental health source statement regarding Mr. Jarrett. (Doc. 6-19, p. 84). CRNP Couch opined that Mr. Jarrett could understand, remember, and carry out very short and simple instructions; could not maintain concentration for two hours at a time because of his "physical limitations"; would not be punctual based on Mr. Jarrett's "self[-]report due to medical issues"; could sustain ordinary routine without special supervision; could adjust to routine

and infrequent work changes; could interact with supervisors and/or co-workers; could maintain socially appropriate behavior; and would be off-task "20-25%" of the time in an eight-hour work day.  (Doc. 6-19, p. 84).  CRNP Couch listed "sedation" and weight gain as side effects of Mr. Jarrett's medications.  (Doc. 6-19, p. 84).

<em>Dr. Nichols's Consultative Mental Examination</em>

On April 23, 2021, at the request of Mr. Jarrett's attorney, Dr. June Nichols, a licensed psychologist at Gadsden Psychological Services, reviewed Mr. Jarrett's medical and psychiatric record from 2007 to 2021 and evaluated him.  (Doc. 6-19, pp. 85-92).  Dr. Nichols provided an extensive written discussion of the findings in the medical records that she reviewed.  (Doc. 16-19, pp. 85-87).  She also provided a lengthy description of Mr. Jarrett's self-reported personal, work, and medical history.  (Doc. 6-19, pp. 87-90).

Mr. Jarrett reported that his health had "taken a nosedive" after he injured his shoulder and that he "was down for five or six months."  (Doc. 6-19, p. 87).  Mr. Jarrett stated that he returned to work and "made it almost a year," but he could not keep up with his construction job.  (Doc. 6-19, p. 87).  Mr. Jarrett indicated that he worked "a few hours each week" at O'Reilly Auto Parts making deliveries.  He stated that he knew the store manager, and she accommodated his limitations.  (Doc. 6-19, p. 88).  Mr. Jarrett indicated that O'Reilly paid for his insurance but did not

pay him wages, the job could end soon because the corporation wanted to cut costs, and he did not know what he would do if he lost that part-time job. (Doc. 6-19, p. 88). He stated that he could not work on computers because he got frustrated if he could not figure something out quickly. (Doc. 6-19, p. 88).

Mr. Jarrett reported that because of his shoulder injury, his hand was numb, burned, and tingled; that he could not lift his arm higher than his chest "without forcing it;" and that he could not "grip the welder stinger without dropping it after a few minutes." (Doc. 6-19, p. 88). Regarding his diabetes, Mr. Jarrett stated that his blood sugar levels would be "40 to 100 in the morning when he [woke] up, if his pump [had] worked, and throughout the day it [was] okay if he [was] doing nothing." (Doc. 6-19, p. 88). He stated that if he was doing something or got upset, his blood sugar levels would "bottom out really fast." (Doc. 6-19, p. 88). Mr. Jarrett reported that some days he might be able to work three hours, but his blood sugar went up and down, and he would fall asleep on the job. (Doc. 6-19, p. 90).

Mr. Jarrett indicated that he had "really high anxiety" that was "really bad in [his] 20s" because he worried about his mom and dad dying. (Doc. 6-19, p. 88). Mr. Jarrett stated that he was hospitalized when he "became severely depressed" and was in counseling, slept two to three hours a night, had severe panic attacks that "tend[ed] to occur at night if he [woke] up," fell asleep on the job, and woke up vomiting every morning. (Doc. 6-19, pp. 88-90). Mr. Jarrett stated that he stopped taking pain

medicine and Xanax because neither medication improved his pain or helped his depression.  (Doc. 6-19, p. 88).

Dr. Nichols noted that Mr. Jarrett had a dysthymic mood, congruent thought processes, good insight and judgment, and a sad and tearful affect throughout the assessment.  (Doc. 6-19, p. 89).  In testing, Mr. Jarrett could not spell the word "world" backwards, could perform simple math, had intact immediate and remote memory, had adequate fund of knowledge, could not interpret proverbs, and could complete two of three similarity items.  (Doc. 6-19, p. 89).  Dr. Nichols concluded that Mr. Jarrett "function[ed] in the [l]ow [a]verage range of intellectual ability." (Doc. 6-19, p. 89).

Dr. Nichols diagnosed Mr. Jarrett with panic disorder, PTSD, generalized anxiety disorder, ADHD, depressive disorder because of his medical conditions, reading and writing learning disorders, and substance use orders that were in remission.  (Doc. 6-19, p. 91).  Dr. Nichols opined that Mr. Jarrett had the following limitations:

> Mr. Jarrett [could] understand, remember[,] and carry out very short and simple instructions.  He [could] maintain attention for short bursts, but he [could not] maintain concentration and pace for periods of two hours.  He [could not] perform activities within a schedule and be punctual within customary tolerances.  He [was] unable to clock in [on time] on his job now because he [was] not able to get there at a regular time.  He [could] maintain an ordinary routine without special supervision.  He [could] adjust to routine and infrequent work changes if there [was] nothing that require[d] reading instructions or work on the computer in the change.  He [] had problems with coworkers and

supervisors in the past and [was] likely to have difficulty maintaining a positive working relationship with supervisors and coworkers. He [could] maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. He would likely be off task 25% o[f] an 8[-]hour day. He would likely fail to report to work 5-6 days in a 30[-]day work period.

(Doc. 6-19, p. 90).

### Mr. Jarrett's Function Report

On September 16, 2019 and May 30, 2020, at the request of the Social Security Administration, Mr. Jarrett completed function reports. (Doc. 6-9, pp. 91-98). Mr. Jarrett explained that he usually checked his blood sugar levels, calibrated his pump, and ate breakfast to start his day. (Doc. 6-9, p. 91). He would try to work delivering parts for O'Reilly's, but he would miss "a lot of hours" because he was often too sick to work and went to doctor's appointments after 12:00 p.m. (Doc. 6-9, p. 91). When he arrived home from work, he would sit in his recliner until he went to bed. (Doc. 6-9, p. 91).

Mr. Jarrett stated that he helped take care of his dog, but his son and daughter fed, washed, and groomed the dog; his daughter cooked and cleaned; and his son did the yard work. (Doc. 6-9, p. 92). He indicated that he could not do yard work because when he got hot or started sweating, his blood sugar dropped; sometimes cooked frozen dinners and pizzas; shopped for personal items once a week; and drove. Mr. Jarrett reported that he could pay bills, count change, and handle a savings and checking account, but he had to pay "close attention." (Doc. 6-9, pp.

42, 93-95).  Mr. Jarrett stated that he enjoyed hunting and fishing but could not do those activities because he could not "hold out to walk" or hold the equipment.  (Doc. 6-9, pp. 43, 92, 95).  Mr. Jarrett indicated that he was "socially closed off," talked with friends twice a month, was "very secluded," and went to church "when he [could]."  (Doc. 6-9, pp. 44, 95-96).  Mr. Jarrett explained that he sometimes needed someone to accompany him to social events.  (Doc. 6-9, p. 95).  He stated that he was afraid that his children would find him dead and that he would be a burden to his family.  (Doc. 6-9, pp. 45, 97).

Mr. Jarrett indicated that his insulin pump's alarm went off at night when his blood sugar was too low or too high and frequently interrupted his sleep.  (Doc. 6-9, p. 92).  He reported that he had difficulty concentrating and had no energy if his blood sugar levels were low, and he threw up and felt sick when his blood sugar levels were high.  (Doc. 6-9, p. 96).  Mr. Jarrett stated that he could walk 50 feet before he needed to rest and had to wait 10 to 15 minutes before he could start walking again; that he could not read well; that he got "along well" with authority figures; and that he did not handle stress or changes in routine well because of his panic attacks and PTSD.  (Doc. 6-9, pp. 45, 97).  Mr. Jarrett indicated that he wore his hearing aids regularly.  (Doc. 6-9, p. 97).

### *Statements from Non-Medical Sources*

Serena Sheppard, Allie Jarrett, and Jennifer Harvell submitted affidavits at the request of Mr. Jarrett's attorney. Ms. Sheppard explained that she had been friends with Mr. Jarrett and his family for about 30 years. (Doc. 6-11, p. 35). Ms. Sheppard stated that she allowed Mr. Jarrett to work with her five days a week at O'Reilly's because, after his mother died, Mr. Jarrett struggled financially. (Doc. 6-11, p. 35). Ms. Sheppard indicated that she "agreed to give [Mr. Jarrett] more hours as long as [they] watch[ed] him physically." (Doc. 6-11, p. 35). She stated that when Mr. Jarrett needed a break, she made sure he took one; when he felt weak or sick, she sent him home; and she sometimes had to take him home. (Doc. 6-11, p. 35). Ms. Sheppard indicated that she had "witnessed [Mr. Jarrett's] pump not acting the way it [was] suppose[d] to, so he would go home to redo it." (Doc. 6-11, p. 35).

Alli Jarrett, Mr. Jarrett's daughter, stated that she and her mother cooked Mr. Jarrett's meals and did his grocery shopping because crowds made him anxious. (Doc. 6-10, p. 17). Ms. Jarrett explained that she helped her father do laundry and clean. (Doc. 6-10, p. 17). Ms. Jarrett stated that she picked up her brother from school because her father's sugar levels were unpredictable and that her father's "roller coaster diabetes" made most things difficult. (Doc. 6-10, p. 17).

Jennifer Harvell, Mr. Jarrett's ex-wife, stated that she helped shop and fix meals for Mr. Jarrett. (Doc. 6-10, p. 19). Ms. Harvell stated that Mr. Jarrett frequently

could not work even though he tried because his health had declined.  (Doc. 6-10, p. 19).

### *Mr. Jarrett's Administrative Hearing*

The ALJ held Mr. Jarrett's administrative hearing by telephone on September 7, 2021.  (Doc. 6-3, p. 45).  At the time, Mr. Jarrett was fifty years old.  (Doc. 6-3, pp. 51-54).  Mr. Jarrett testified that his ex-wife and two teenage children lived in the basement of his house and that he received food stamps.  (Doc. 6-3, p. 52).  He stated that he did not know how to operate his cellphone but used it for calling, texting, and social media; he could read and write "very little."  (Doc. 6-3, pp. 53-54).

Mr. Jarrett testified that he had past work as a service writer and welder.  (Doc. 6-3, pp. 58-59).  Mr. Jarrett stated that he worked 32-34 hours per week as a truck driver for O'Reilly Auto Parts.  (Doc. 6-3, pp. 54-55).  He stated that he was five to 20 minutes late to work every day because of his impairments.  (Doc. 6-3, p. 65).  Mr. Jarrett stated that when he arrived at the store in Huntsville, someone loaded parts on his truck for him, and then someone unloaded the parts at the store to which he delivered them.  (Doc. 6-3, pp. 54-55, 61).  Mr. Jarrett testified that he only made "parts runs," did not help customers, and did not work on the cash register.  (Doc. 6-3, p. 56).  Mr. Jarrett indicated that he had difficulty interacting with people he encountered on his deliveries because he could not hear detailed conversations very

well and got "lost in the words." (Doc. 6-3, pp. 71-72). He stated that he was embarrassed to ask people multiple times to repeat themselves, so he "did not interact or have conversations with people" a lot. (Doc. 6-3, pp. 71-72).

Mr. Jarrett stated that O'Reilly Auto Parts paid him $10 an hour and provided health and life insurance. (Doc. 6-3, p. 55). Mr. Jarrett testified that his boss, Serena Sheppard, made generous accommodations for his disability. Ms. Sheppard allowed him to sit in her office three to four times a week instead of driving the company truck when his blood sugar levels were too high or when he was too tired to drive because of lack of sleep. (Doc. 6-3, pp. 56-57, 64).

Regarding his diabetes, Mr. Jarrett testified that his blood sugar readings generally varied between 150 and 180 but sometimes fluctuated as high as 300 or 400 with insulin which made him rattled and antsy. (Doc. 6-3, p. 70). Mr. Jarrett also testified that diabetes caused him to lose weight. (Doc. 6-3, p. 71). Mr. Jarrett stated that he previously weighed 304 pounds, but his weight fell to 133 pounds before increasing again to 170 pounds. (Doc. 6-3, p. 71). Mr. Jarrett explained that he took Seroquel to help him sleep, that he was constantly tired, and that he did not sleep more than three hours a night because he was afraid that he would die in his sleep because of his diabetes. (Doc. 6-3, p. 63).

Mr. Jarrett testified that because of a right shoulder injury, he has cables in his shoulder to hold his shoulder together. (Doc. 6-3, p. 61). Mr. Jarrett explained that

he is right-handed and that because of the hardware in his right wrist that anchors the cables for his right shoulder, he could not lift objects from the ground, turn a doorknob, or button a shirt with his right hand. (Doc. 6-3, pp. 61-62). For that reason, other employees at O'Reilly loaded and unloaded parts from his truck. (Doc. 6-3, p. 61). Mr. Jarrett stated that he could brush his teeth with his right hand, and he sometimes could use a fork. (Doc. 6-3, p. 68). He testified that he could stand in one spot about ten minutes before he had to sit down or move around. (Doc. 6-3, p. 62).

When the ALJ asked Mr. Jarrett to describe the incidents that caused his PTSD, Mr. Jarrett explained that he had "witnessed a lot of bad things" and had two best friends die in his arms. (Doc. 6-3, p. 60). He stated that he had episodes daily when he was not able to think about anything other than those incidents. (Doc. 6-3, p. 72). Mr. Jarrett testified that he was not taking medication for his mental health because he did not like the side effects or how the medications made him feel. (Doc. 6-3, p. 64).

Dr. Robert Beadles, a vocational expert, identified Mr. Jarrett's past work as a delivery driver as semi-skilled work performed at medium exertion level; as a service writer as skilled work performed at a light exertion level; and as a welder as skilled work performed at a heavy exertion level. (Doc. 6-3, pp. 74-75). The ALJ asked Dr. Beadles to consider the work available to an individual with the same age,

education, and past work experience as Mr. Jarrett who could perform light work

with the following limitations:

> [could] frequently push and pull with the right, upper extremity[;] . . .
> [could] occasionally climb ramps and stairs; [could not] climb ladders,
> ropes, and scaffolds[;] . . . [could] frequently stoop, kneel, crouch, and
> crawl[;] . . . [could] frequently reach with the right, upper extremity[;]
> . . . [could] occasionally be exposed to . . . extreme cold [or] extreme
> heat[;] . . . [could not] be exposed to workplace hazards, such as
> moving, mechanical parts, and high, exposed places[;] . . . [could] work
> in job environments where the noise intensity level does not exceed
> moderate[;] and [could] work in a low-stress environment . . . [at] tasks
> that [were] detailed, but uninvolved in nature, with no flexible or fast-
> paced production requirements, and no more than occasional changes
> in the work setting.

 (Doc. 6-3, pp. 74-75).  Dr. Beadles testified that the hypothetical individual could

not perform Mr. Jarrett's past work as a delivery driver, service writer, and welder.

(Doc. 6-3, p. 75).   Dr. Beadles stated that the individual could perform light,

unskilled work as a bench assembler, with 150,000 available jobs nationally; as an

electrical assembler, with 180,000 available jobs nationally; and as a mail clerk, with

120,000 available jobs nationally.  (Doc. 6-3, pp. 75-76).  Dr. Beadles testified that

two or more absences per month on a "regular and ongoing basis" would preclude

competitive work.  (Doc. 6-3, p. 76).  Dr. Beadles stated that in addition the regular

breaks, "off task behavior" greater than 15 percent of an eight-hour workday would

preclude competitive employment.  (Doc. 6-3, pp. 76-77).

Dr. Beadles stated that adding to the ALJ's hypothetical the limitation that the

individual could occasionally handle, finger, or feel with one hand would preclude

34

the light, unskilled jobs he had identified.  (Doc. 6-3, p. 77).  Dr. Beadles testified that an individual who could not maintain attention, concentration, persistence, or pace for "any period of two hours or greater" or who could not interact with coworkers and supervisors could not sustain competitive employment.  (Doc. 6-3, p. 78).

## THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision.  (Doc. 6-3, pp. 23-36).  The ALJ found that Mr. Jarrett had not engaged in substantial gainful activity since May 1, 2019, the alleged onset date.  (Doc. 6-3, p. 26).  The ALJ explained that he "considered [Mr. Jarrett's] work activity since the alleged onset date" and determined that "although some work [was] potentially above the level of substantial gainful activity," he would defer his decision at step one and decide Mr. Jarrett's claim at step five.  (Doc. 6-3, p. 26).  The ALJ stated that Ms. Sheppard's affidavit regarding the accommodations she gave Mr. Jarrett at O'Reilly' Auto Parts was "somewhat vague" and did not "completely corroborate" Mr. Jarrett's description of workplace accommodations.  (Doc. 6-3, p. 26).  The ALJ noted the he considered Mr. Jarrett's "earnings record and capacity for work in determining his residual functional capacity."  (Doc. 6-3, p. 26).

The ALJ determined that Mr. Jarrett suffered from the severe impairments of hearing loss, right shoulder degenerative joint disease, diabetes mellitus with

neuropathy, anxiety disorder, ADHD, PTSD, and Addison's disease, (Doc. 6-3, p.

26), and the non-severe impairments of hepatitis B, high blood pressure, high

cholesterol, and gastroesophageal reflux disease, (Doc. 6-3, p. 28).  Based on a

review of the medical evidence, the ALJ concluded that Mr. Jarrett did not have an

impairment or a combination of impairments that met or medically equaled the

severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Doc. 6-3, p. 28).

Considering Mr. Jarrett's impairments, the ALJ evaluated Mr. Jarrett's

residual functional capacity.  The ALJ determined that Mr. Jarrett had the RFC to

perform:

> light work as defined in 20 CFR 303.1567(b) and 416.967(b) except:
> [he could] frequently push or pull with the right upper extremity;
> [could] occasionally climb ramps or stairs[;] [could] never climb
> ladders, ropes or scaffolds; [could] frequently stoop, kneel, crouch, or
> crawl; [could] frequently reach bilaterally; [could] occasionally be
> exposed to weather or humidity, extreme cold, [or] extreme heat;
> [could] never be exposed to workplace hazards such as moving
> mechanical parts and high, exposed places; [could] work in job
> environments where the noise intensity level [did] not exceed moderate
> as defined in the <u>Selected Characteristics of Occupations</u>; and [could]
> work in a low-stress work environment, defined as: tasks that [were]
> detailed but uninvolved in nature, with no inflexible or fast-paced
> production requirements, and no more than occasional changes in the
> work setting.

(Doc. 6-3, pp. 29-30).  Based on this RFC and relying on the testimony from Dr.

Beadles, the ALJ concluded that Mr. Jarrett could not perform his past relevant work

but could perform other jobs that existed in significant numbers in the national

economy, including bench assembler, electrical assembler, and mail clerk. (Doc. 6-3, pp. 35-36). Accordingly, the ALJ determined that Mr. Jarrett was not disabled as defined by the Social Security Act. (Doc. 6-3, p. 36).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r,*

*Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Jarrett contends that the ALJ improperly considered the medical opinions of examining consultative doctors who evaluated Mr. Jarrett's mental and physical limitations.  Among other things, Mr. Jarrett argues that the ALJ did not adequately evaluate the consistency and supportability of Dr. Robles's opinion in determining Mr. Jarrett's RFC.

An ALJ must consider five factors when evaluating the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and "other factors."  20 C.F.R. § 416.920c(1)-(5); *see Harner v. Comm'r of Soc. Sec.*, 38 F.4th 892, 897 (11th Cir. 2022).  The most important factors are supportability and consistency, and an ALJ must "explain how he considered the supportability and consistency factors for a medical source's medical opinions . . .

in his determination or decision." 20 C.F.R. § 416.920c(b)(2).[14]  When considering

the supportability of a medical opinion, "[t]he more relevant the objective medical

evidence and supporting explanations presented by a medical source are . . . the more

persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1).  And when

considering the consistency of a medical opinion, "[t]he more consistent a medical

opinion[] . . . is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion[] . . . will be." 20

C.F.R. § 416.920c(c)(2).

Here, the ALJ stated that he considered the medical opinions and prior

administrative medical findings in accordance with the requirements of 20 C.F.R.

§§ 404.1520(c) and 416.920c.  (Doc. 6-3, p. 33).  In discussing Dr. Roble's opinion,

the ALJ stated:

> The medical source opinion from Dr. Monica Robles at Exhibit B8F is
> not helpful to the evaluation, and I find it not persuasive.  This [was] a
> form that was provided to Dr. Robles and simply [had] been marked up
> and returned with little explanation.  I relied much more heavily on Dr.
> Robles's treatment records and notes when determining the claimant's
> residual functional capacity.  The latest records from Dr. Robles
> (Exhibit B16F) show that [Mr. Jarrett was] neurologically intact, stable,
> and do not support total disability.

(Doc. 6-3, p. 33).

---

[14]  An ALJ does not have to articulate how he considered the other three factors.  20 C.F.R. §
416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in
paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical
opinions . . . in your case record.").

Mr. Jarrett argues that the ALJ did not adequately explain the supportability and consistency of Dr. Robles's opinion regarding Mr. Jarrett's need for unscheduled breaks during the workday to check his blood sugar levels and Mr. Jarrett's standing and walking limitations. (Doc. 12, p. 16). The Court agrees. As an initial point, the Court notes that in his brief, the Commissioner outlined the ALJ's holding regarding Dr. Robles's assessment, but the Commissioner did not respond to Mr. Jarrett's arguments regarding the assessment or otherwise explain how binding precedent supports the ALJ's conclusion that the assessment was not helpful. (Doc. 17, p. 7). Mr. Jarrett's argument is largely unrebutted.

Mr. Jarrett argues that the ALJ could not discount Dr. Robles's assessment simply because she provided her assessment on a form. As noted, the ALJ remarked that Dr. Robles's opinion was not helpful in part because she simply "marked up" a form and returned the form "with little explanation." (Doc. 6-3, p. 33). In *Schink v. Comm'r of Soc. Sec.*, the Eleventh Circuit held that an ALJ improperly rejected medical opinions based on the format of the questionnaire the doctors completed and that "the regulations do not require a doctor's opinion to take a certain form." 935 F.3d 1245, 1261 (11th Cir. 2019). That holding supports Mr. Jarrett's argument.

The diabetes residual functional capacity questionnaire that Dr. Robles completed is not an SSA form, but it is not without substance. The four-page form contains detailed questions regarding the limitations associated with diabetes. (Doc.

6-14, pp. 54-57).   Dr. Robles based her assessment on the limitations she attributed to Mr. Jarrett's diabetes and clearly identified the questions to which she did not have a response.   Dr. Robles marked "YES" to the question: "Will your patient sometimes need to take unscheduled breaks during an 8-hour working day?"  (Doc. 6-14, p. 55).  Dr. Robles explained that she did not know how often Mr. Jarrett would need to take unscheduled breaks during a workday to check his blood sugar levels, but he would need about five minutes for an unscheduled break, would not need to lie down or sit quietly during the breaks, and would have good and bad days because of his diabetes.  (Doc. 6-14, pp. 56-57).  Dr. Robles also opined that Mr. Jarrett could stand and walk about four hours and sit for at least six hours in an eight-hour workday, should avoid all exposure to heat and hazards, and should avoid concentrated exposure to extreme cold.   (Doc. 6-14, pp. 56-57).   These opinions were not vague and were based on her routine treatment of Mr. Jarrett for nearly two years.

Dr. Robles's treatment records are consistent with the opinions she provided in the diabetes functional capacity questionnaire.  The ALJ acknowledged that Mr. Jarrett's "sugar levels fluctuate[d]" and that he needed to check his sugar levels but stated that Mr. Jarrett was "medically stable."  (Doc. 6-3, p. 32).  Dr. Robles's records indicate that as compared to May 2018 when Mr. Jarrett's blood sugar levels were very unstable on an old insulin pump, in November 2018, his levels had

improved and were "very good" when his insulin pump was in auto mode, (Doc. 6-14, pp. 18, 39, 42). Still, Mr. Jarrett's blood sugar levels sometimes registered either too high or too low, (Doc. 6-14, pp. 22, 31, 35). In August 2019, when Dr. Robles submitted her medical source statement, Mr. Jarrett complained to Dr. Roble that he was "very frustrated" and had a hard time controlling his blood sugar levels when he went into manual mode. (Doc. 6-14, p. 9). Although Dr. Robles indicated that Mr. Jarrett was doing well in October 2019 and was on auto mode 70 percent of the time, Dr. Robles documented that Mr. Jarrett's blood sugar levels were normal only 76 percent of the time and that he was hyperglycemic 26 percent of the time. (Doc. 6-15, p. 53). In February 2020, Mr. Jarrett's insulin pump was on auto mode 84 percent of the time, but he maintained a normal blood sugar level only 68 percent of the time. (Doc. 6-15, p. 48).

These records of routinely fluctuating blood sugar levels are consistent with Dr. Robles's opinion that Mr. Jarrett would need unscheduled breaks during the workday to check his blood sugar levels. So are Dr. Robles's notes that Mr. Jarrett reported difficulty controlling his blood sugar levels when his insulin pump was in manual mode, (Doc. 6-14, p. 9), which was about 20 or 30 percent of the time. Likewise, as Mr. Jarrett argued, the note in Dr. Robles's treatment records that Mr. Jarrett sometimes could not wear his glucose sensor during the workday because he sweat at work, (Doc. 6-15, p. 53), is consistent with Dr. Robles's opinion that Mr.

Jarrett must avoid all exposure to extreme heat, (Doc. 16-14, p. 57).  The ALJ did not include this full limitation in his RFC but instead permitted occasional exposure to extreme heat.  (Doc. 6-3, p. 30).

Dr. Robles's opinion that Mr. Jarrett would need breaks at work to check his blood sugar levels also is consistent with the non-medical evidence from Mr. Jarrett's boss, Ms. Sheppard.  Ms. Sheppard reported that she gave Mr. Jarrett breaks at work whenever he needed them, and she had "witnessed his pump not acting the way it [was supposed] to."  (Doc. 6-11, p. 35).  Ms. Sheppard stated that Mr. Jarrett would have to go home to "redo" his pump when the pump was not working properly.  (Doc. 6-11, p. 35).  Thus, substantial evidence does not support the ALJ's decision to find Dr. Robles's medical source statement unpersuasive.

Dr. Robles's opinion about Mr. Jarrett's need for unscheduled breaks during an eight-hour workday may be significant because VE Beadles testified that in addition the regular breaks, "off task behavior" greater than 15 percent of an eight-hour workday would preclude competitive employment.  (Doc. 6-3, pp. 76-77).  The record indicates that Mr. Jarrett's off-task behavior consists not only of five-minute breaks to check his sugar levels but also of longer breaks to adjust his pump or to

address times when he is hyper or hypoglycemic. As Dr. Robles opined, Mr. Jarrett would have good and bad days because of his diabetes. (Doc. 6-14, pp. 56-57).[15]

Mr. Jarrett's work at O'Reilly's indicates that he is not incapable of work, and the ALJ's assessment of the mental demands of a commercial driving position is well-taken. (Doc. 6-3, p. 32). But Mr. Jarrett's part-time work must be considered in the context of the tremendous flexibility he had in that job. Dr. Beadles testified that two or more absences per month on a "regular and ongoing basis" would preclude competitive work. (Doc. 6-3, p. 76). To avoid absences, Mr. Jarrett must be able to maintain a regular work schedule with more conservative accommodations than the accommodations his friend at O-Reilly's provided.

Because the ALJ did not provide sufficient reasoning to demonstrate that he conducted a proper legal analysis in evaluating Dr. Robles's opinion, remand is appropriate. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)

---

[15] The ALJ did not include in his hypothetical to Dr. Beadles or in Mr. Jarrett's RFC that Mr. Jarrett needed off-task time to check his blood sugar levels.

Dr. Robles also opined that Mr. Jarrett could stand or walk about four hours in an eight-hour day. (Doc. 6-14, p. 55). Dr. Robles's records show that Mr. Jarrett had diabetic neuropathy in both legs and a diabetic ulcer on his left foot. (Doc. 6-14, pp. 31, 52). The ALJ did not discuss these findings in Dr. Robles's treatment records or explain how the findings were inconsistent with Dr. Robles's opinion regarding Mr. Jarrett's standing and walking limitations because of his diabetic neuropathy and pain. In assigning Mr. Jarrett an RFC for light work, the ALJ acknowledged that jobs in the light category may "require[] a good deal of walking or standing" and that "to be considered capable of performing a full range of light work," an applicant "must have the ability to do substantially all of these activities," including standing and walking a good deal. (Doc. 6-3, p. 29 n. 1).

(The ALJ's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); *see also Spaar v. Kijakazi*, No. 5:20-cv-94, 2021 WL 6498838, at *5, *report and recommendation adopted*, 2022 WL 141613 (S.D. Ga. Jan. 14, 2022) (concluding that error in failing to address the supportability of medical opinions could not be harmless under the new regulations where the medical opinions, if adopted as a component of the claimant's RFC, could have resulted in the difference between performing light work and being disabled).[16]

On remand, the ALJ should reexamine the evidence concerning Dr. Rinn's opinion. Dr. Rinn, a psychologist who examined Mr. Jarrett at the request of the SSA, opined that Mr. Jarrett might have difficulty responding appropriately to supervisors and coworkers. The ALJ attributed Dr. Rinn's assessment to Mr. Jarrett's hearing impairment, (Doc. 6-3, p. 27), but Dr. Rinn indicated that Mr. Jarrett was moderately to severely mentally impaired and had "maladaptive behaviors," including inattention, hyperactivity, and impulsivity. (Doc. 6-14, p. 105). The ALJ found that Mr. Jarrett had only a mild limitation in interacting with others, in part because he shopped, (Doc. 6-3, p. 28), but Mr. Jarrett told Dr. Rinn that he shopped

---

[16] Because the Court will remand based on the ALJ's improper evaluation of Dr. Robles's opinion, the Court will not reach the other issues Mr. Jarrett raised in his brief.

"very little" because of his anxiety, (Doc. 6-14, p. 104).[17]  The ALJ also based his

finding that Mr. Jarrett had only mild limitation in interacting with others on the fact

that Mr. Jarrett attended church, (Doc. 6-3, p. 28), but Mr. Jarrett reported to Dr.

Rinn in 2019 that he attended church services "infrequently," (Doc. 6-14, p. 104),

and Mr. Jarrett told Dr. Nichols in 2021 that he did not attend church, (Doc. 6-19, p.

90).  An ALJ may not select the parts of a claimant's daily activities that support his

conclusion but disregard testimony regarding limitations in performing those daily

activities.  *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) ("It is not

enough to discover a piece of evidence which supports [a] decision, but to disregard

other contrary evidence[,]" and a decision is not supported where it was reached "by

focusing upon one aspect of the evidence and ignoring other parts of the record").

## CONCLUSION

For the reasons discussed above, the Court remands this matter to the

Commissioner for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 25, 2024.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[17] Alli Jarrett explained in her affidavit that she and her mother shopped for Mr. Jarrett because crowds made him nervous.  (Doc. 6-10, pp. 17, 48).